(921 P.2d 821)

No. 73,928

St. David's Episcopal Church, *Appellee*, v. Westboro Baptist Church, Inc., *Appellant*.

Opinion filed June 21, 1996.

*Margie J. Phelps* and *Chris R. Davis*, of Phelps-Chartered, of Topeka, for appellant.

*Jerry R. Palmer*, of Palmer & Lowry, and *Alan V. Johnson*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, for appellee.

Before BRAZIL, C.J., LEWIS, J., and TOM MALONE, District Judge, assigned.

BRAZIL, C.J.: Westboro Baptist Church (Westboro) appeals from what it considers a temporary injunction by the trial court. St. David's Episcopal Church (St. David's) filed a petition based in nuisance seeking to enjoin Westboro from engaging in focused picketing activity within certain distances of St. David's property shortly before, during, and shortly after any religious event at St. David's. The trial court issued a temporary restraining order (TRO) and an amended TRO which granted most of the restrictions sought by St. David's. After the court denied Westboro's motion to vacate or to alter, amend, or modify the TRO, Westboro perfected this appeal. Westboro's main contention on appeal is that the court erred in issuing what it considers, in effect, a temporary injunction. Westboro also challenges an order which denied its motion for a change of judge and challenges the trial court's failure to require a bond before issuing the injunction.

Because a full evidentiary hearing has yet to be held in this case, the facts have been taken from the pleadings and affidavits relative to each of the respective appealed-from orders.

St. David's maintains a house of worship on the northwest corner of 17th and Gage streets in Topeka. Since about March 1992, Westboro has conducted demonstrations and picketing activities on each of the four corners of that intersection.

On June 13, 1994, St. David's filed its petition alleging that Westboro's activities constituted a private nuisance and requesting a temporary injunction against Westboro and, ultimately, a permanent injunction. The petition defined focused picketing as "standing, sitting or walking at a deliberately slow speed or walking repeatedly around Plaintiff's house of worship by any person governed by the order, while carrying a banner, placard or sign." The petition defined a religious event as "any scheduled worship

service (5:30 p.m. Saturday; 8:30 a.m. and 10:30 a.m. Sundays), and any wedding, funeral, memorial service for the dead or the observation of other sacraments, rituals, or celebrations which are announced by a sign posted within 10 feet of the St. David's sign on 17th Street which announces its ordinary services." The petition further sought to restrain Westboro "from making any noise by singing, chanting, shouting or yelling, that can be heard through the walls of the church during any religious event." St. David's filed with its petition affidavits from nine persons associated with St. David's describing Westboro's picketing activities and the alleged harm caused by Westboro.

On July 1, 1994, Westboro filed a notice of removal to the United States District Court for the District of Kansas. The United States District Court granted St. David's motion to remand, finding that, under the well-pleaded facts of the original petition, the court lacked subject matter jurisdiction. That judgment was filed in the state district court on July 18, 1994.

On July 18, 1994, St. David's filed a motion for a TRO. The motion was based in part on St. David's belief that Westboro's attempt to remove the case was in bad faith and had caused an inequitable delay in the state court proceedings. The trial court had scheduled a hearing on the original petition to be held July 12-13, 1994, but later continued the hearing upon Westboro's removal notice. In its motion, St. David's requested the TRO "[f]or purposes of good public policy and the orderly and efficient administration of justice" because Westboro's attempt at removal had delayed the injunction hearing to the detriment of St. David's rights.

The parties and the court apparently held a telephone conference on July 19, 1994, concerning St. David's motion for a TRO. At that time, the court stated it would allow the parties to submit any support for their positions but that it would take some action on the matter on July 21, 1994.

At 10:51 A.M. on July 21, 1994, Westboro filed a response to St. David's motion and a motion for judgment on the pleadings and to dismiss. The response contained 13 supporting affidavits and numerous exhibits, amounting to a 245-page filing.

At 2:14 P.M. on July 21, 1994, the court issued a TRO against Westboro "pending a hearing on a temporary injunction." The order restrained Westboro:

"1. From engaging in focused picketing of plaintiff on public property within 36 feet to the east, within 36 feet to the west, within 36 feet to the north and within 215 feet to the south of the church property owned and used for religious purposes by St. David's (the property located on the northwest corner of 17th and Gage) from a period beginning one-half hour before and ending one-half hour after a religious event. The distance is to be measured from all points along the property line of the church's property.

"2. That 'focused picketing' means picketing by driving, standing, sitting or walking at a deliberately slow speed or walking repeatedly past or around plaintiff's house of worship by any person governed by the Order, while carrying a banner, placard, or sign. 'Religious event' means any scheduled worship service 5:30 p.m. Saturday, 8:00 a.m. and 10:30 p.m. Sundays, and any wedding, funeral, memorial service for the dead, or the observation of other sacraments, rituals, or celebrations which are announced by a sign posted within ten feet of the St. David's sign on 17th Street which announces its ordinary services.

"3. Defendant and the others described above likewise will be restrained from making any noise by signing [sic], chanting, shouting or yelling, that can be heard through the walls of the church during any religious event.

"4. The Sheriff of Shawnee County, Kansas is directed to personally serve a copy of this Temporary Restraining Order on the Reverend Fred W. Phelps, as resident agent and personally as the pastor of defendant Westboro Baptist Church at 3701 West 12th Street, Topeka, Kansas, 66604, and upon any and all persons engaged in picketing or carrying or displaying any signs or placards at St. David's Episcopal Church at 3916 West 17th Street, Topeka, Shawnee County, Kansas."

On July 25, 1994, Westboro filed a "MOTION TO VACATE OR TO ALTER, AMEND OR MODIFY TEMPORARY RE-STRAINING ORDER & MOTION FOR ORDER REQUIRING PLAINTIFF TO PAY FOR AND PROVIDE A SURVEY & TO MARK THE BUFFER ZONE & MOTION FOR IMMEDIATE HEARING." Among other things, the motion alleged judicial bias by the trial court in issuing the TRO. This allegation involved the trial court's apparent signature on a petition which had run in the local Topeka newspaper more than a year earlier. This petition, apparently aimed at Westboro's crusade against homosexuality, stated:

"We, the undersigned, offer witness of our belief that all people have the right to live in dignity, in safety and in privacy, regardless of age, gender, race, ethnicity,

religious preference or sexual orientation. We embrace love rather than hate; safety rather than endangerment, respect rather than harassment. Our commitment to these beliefs compels us to create a community that promotes these values."

Following a hearing held August 9, 1994, the court denied Westboro's motions of July 25, 1994.

On July 27, 1994, St. David's moved the court to amend its TRO. According to St. David's motion and accompanying affidavit, after the original TRO was issued, Westboro had continued to demonstrate at the places and times prohibited by the original TRO but did so without carrying banners, placards, or signs. Westboro filed a response opposing the motion. The court issued an "AMENDED TEMPORARY RESTRAINING ORDER" on July 29, 1994. The only substantive difference in this amended TRO involves paragraph 2 of the order which redefines focused picketing as "picketing *or demonstrating* by driving, standing, sitting or walking at a deliberately slow speed or walking repeatedly past or around Plaintiff's house of worship by any person governed by the Order, *with or without* a banner, placard, or sign." (Emphasis added.)

On August 14, 1994, Fred W. Phelps, Westboro Pastor, conducted a broadcast on a Topeka radio station which contained comments alleging misconduct by the trial judge, Michael A. Barbara. On September 15, 1994, a FAX "News Release" from Westboro contained derogatory comments and depictions of Judge Barbara. Based upon these events, and based upon comments by Margie Phelps, Westboro trial counsel during the September 20, 1994, hearing on Westboro's motion for a change of judge, contempt proceedings were ultimately filed against Fred Phelps and Margie Phelps. As a result, the court found Fred Phelps in indirect contempt of the court and Margie Phelps in direct contempt of the court. This decision was announced on the record by the court on October 19, 1994, and journalized December 19, 1994. Those contempt citations are the subject of a separate appeal in this court.

As a result of the attention devoted to the contempt proceedings, considerable delay occurred with regard to the TRO. During the pendency of the contempt proceedings, the Kansas Supreme Court assigned a judge to determine the legal sufficiency of Westboro's

affidavit to disqualify Judge Barbara. On October 17, 1994, the judge concluded the affidavit was legally insufficient.

On November 28, 1994, Westboro filed a motion which, among other things, requested the court to expedite the hearing on the temporary injunction and opposed consolidation of the temporary injunction hearing with the trial on the merits.

After a hearing held December 19, 1994, the court, on the record, denied all of Westboro's outstanding motions. The journal entry of the court's decision was not filed until March 16, 1995. At the December 19, 1994, hearing, the court and the parties set April 10, 1995, as a tentative date for a consolidated trial on the temporary and permanent injunctions.

On March 9, 1995, St. David's moved to file a first amended petition. The first amended petition contained the original nuisance count and also a second count alleging service mark infringement by Westboro for depicting St. David's church sign in its signs, placards, and banners. On March 28, 1995, the court granted St. David's motion over Westboro's objection.

On April 13, 1995, Westboro filed a notice of appeal from the TRO, the amended TRO, and the court's denial of Westboro's motions to vacate or amend those TROs.

On May 2, 1995, this court ordered the parties to show cause why the appeal should not be dismissed as no temporary injunction had yet been ordered by the trial court. After noting the responses of the parties, this court retained the appeal on May 31, 1995.

Westboro first contends the court failed to afford it an adequate opportunity to be heard before the temporary injunction was issued.

K.S.A. 60-905(a) states: "No temporary injunction shall be granted until after reasonable notice to the party to be enjoined and an opportunity to be heard." Absent unusual circumstances, a hearing is required before a temporary injunction restraining First Amendment rights may be issued. *State v. Alston*, 256 Kan. 571, 579-80, 887 P.2d 681 (1994).

Westboro complains it was not provided a formal hearing before the July 21, 1994, order was issued. Underlying this argument is Westboro's position that the July 21, 1994, order was, in fact, a

temporary injunction. We disagree. Although the TRO, as amended, eventually ripened into a temporary injunction for reasons stated below, on July 21, 1994, the order that issued was a TRO, and Westboro was provided more due process than normally is provided for a TRO. Westboro also maintains that, although it had submitted substantial evidence to the court in the form of affidavits, exhibits, and photographs prior to the July 21, 1994, order, the court could not have given adequate consideration to this evidence given the court's time constraints. Again, we disagree.

Westboro responded by providing the court with a 240-page filing. In its memorandum in support of the TRO, the court stated it had reviewed Westboro's filing, although it had not reviewed a videotape which was also submitted by Westboro. (The videotape is not included in the record on appeal.)

Although not given an opportunity to put on witnesses in support of its filing, Westboro has admitted on appeal that a hearing would not have furthered its position in any material respect. According to Westboro's response to the show cause order, "[a]ny further evidentiary hearing would do nothing but build on or fill in the current positions of the parties. No new issues, factual or legal, will be presented." Given Westboro's position that a hearing was unnecessary, we will not consider its argument that the lack of a hearing violated its due process.

For these same reasons, and because of the length of time in which the TRO or an amended version has been in effect, we conclude that the TRO had ripened into a temporary injunction by the time that this appeal was filed. See *City of Wichita v. Home Cab Co.*, 151 Kan. 679, 684-85, 101 P.2d 219, *cert. denied* 311 U.S. 677 (1940); *Bowman v. Hopper*, 125 Kan. 680, 682, 265 Pac. 743 (1928).

Westboro next contends the court erred in issuing the temporary injunction.

There are four prerequisites to obtain a temporary injunction: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed

injunction may cause the opposing party; and (4) a showing that the injunction, if issued, will not be adverse to the public interest. *Wichita Wire, Inc. v. Lenox*, 11 Kan. App. 2d 459, 462, 726 P.2d 287 (1986). "A trial court's decision to grant or deny an injunction is discretionary and will not be disturbed on appeal absent a showing of an abuse of discretion. [Citation omitted.] The burden is on an appellant to show that the trial court abused its discretion by issuing the temporary injunction." 11 Kan. App. 2d at 462.

## Substantial likelihood of prevailing

The question of whether St. David's had a substantial likelihood of prevailing on its nuisance claim is clouded by the procedural posture of this case. In its TRO, the trial court made limited findings concerning the potential for violence at the picketing locality and expressly deferred the issue of whether Westboro's picketing involved unprotected speech. Although the parties assure this court that a full hearing on the temporary injunction would not have contributed to the evidentiary record, the fact remains that the trial court has not had the opportunity to weigh the evidence and make the factual findings which are essential to this court in ruling on these difficult constitutional issues. In determining whether St. David's had a substantial likelihood of prevailing on its nuisance claim, we, as an appellate court, do not weigh the facts and, therefore, must consider the facts drawn from St. David's petition viewed in the light most favorable to St. David's.

The merits of St. David's petition are based upon a claim of private nuisance. In *Williams v. Amoco Production Co.*, 241 Kan. 102, 117, 734 P.2d 1113 (1987), our Supreme Court, citing Prosser and Keaton on Torts, announced four requirements for recovery on a private nuisance claim: (1) The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial; and (4) the interference was of such a nature, duration, or amount

as to constitute unreasonable interference with the use and enjoyment of the land.

Westboro argues there is nothing in the record to suggest it had knowledge that its picketing activities were causing harm to St. David's.

"Occasionally, the defendant may act from a malicious desire to so harm for its own sake; but more often the situation involving a private nuisance is one where the invasion is intentional merely in the sense that the defendant has created or continued the condition causing the interference with full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow." Prosser and Keeton on Torts § 87, pp. 624-25 (5th ed. 1984).

Certainly, if Westboro were found to be employing speech which is not constitutionally protected—fighting words, obscenity, and the like—then it seems it should have known that harm to St. David's was substantially certain to follow from its picketing activity and St. David's would have a substantial likelihood of prevailing on the merits. Again, however, because the trial court has not yet addressed the issue of whether Westboro was employing unprotected speech in its picketing activity, this court is not in a good position to determine this issue.

As to the trial court's finding that there was a threat of physical violence at the picketing locality, the affidavits filed with the petition show several members of St. David's expressed concern for the physical safety of themselves and/or their children upon entering or leaving church services. The question, however, is (1) whether Westboro's conduct was unreasonable, and (2) if so, whether, on balance, the gravity of harm to St. David's outweighed the utility of Westboro's conduct. See *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 22, 431 S.E.2d 828, *rev. denied* 335 N.C. 175 (1993), *cert. denied* 129 L. Ed. 2d 894 (1994) (discussing nuisance in the context of an injunction which prevented anti-abortion activists from picketing within a specified distance of the residence of a doctor who performed abortions).

Westboro argues its actions were not unreasonable because of St. David's efforts to counter-picket at the site. The *Kaplan* court, in discussing whether an interference with the use and enjoyment of one's land is unreasonable, stated:

" 'Reasonableness is a question of fact to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the conduct of the defendant. . . . Determination of the gravity of the harm involves consideration of the extent and character of the harm to the plaintiff, the social value which the law attaches to the type of use which is invaded, the suitability of the locality for that use, the burden on plaintiff to minimize the harm, and other relevant considerations arising upon the evidence. Determination of the utility of the conduct of the defendant involves consideration of the purpose of the defendant's conduct, the social value which the law attaches to that purpose, the suitability of the locality for the use defendant makes of the property, and other relevant considerations arising upon the evidence.' " 111 N.C. App. at 22 (quoting *Pendergrast v. Aiken*, 293 N.C. 201, 217, 236 S.E.2d 787 [1977]).

Westboro asserts that, because St. David's engaged in counter-picketing activities, it failed to minimize any harm by Westboro. Westboro also claims that St. David's actions underscored the suitability of the locality for picketing.

The record shows that Westboro conducted its picketing activities for nearly a year before St. David's responded with picketing of its own. In addition, although St. David's may have engaged in picketing activity at some point, at issue in this case is the *manner* in which *Westboro* conducted its picketing activity at the locality. The affidavits before the trial court show that Westboro picketed in such a manner that the religious worship of St. David's was infringed by the fear held by St. David's members that physical violence might occur. The trial court found these circumstances particularly escalated in light of the fact that children accompanied their parents to the religious services. The trial court's findings are supported by the limited record that is before this court. Thus, there is substantial evidence to find that the gravity of the harm to St. David's outweighed the utility of Westboro's conduct. If the trial court finds that Westboro has employed constitutionally unprotected speech as well in its picketing activities, then this issue will weigh even more in St. David's favor.

In short, the affidavits filed with St. David's petition show there was an interference with the use and enjoyment of its property that was intentional, substantial, and unreasonable. Based upon these affidavits, St. David's has a substantial likelihood of prevailing on its nuisance claim. " 'It is only necessary that plaintiffs establish a

reasonable probability of success, and not an "overwhelming" like-lihood of success, in order for a preliminary injunction to issue.'" *Wichita Wire*, 11 Kan. App. 2d at 463-64 (quoting *Atchison, T. & S.F. Ry. Co. v. Lennen*, 640 F.2d 255, 261 [10th Cir. 1981]).

## Irreparable injury

Westboro does not specifically address this issue. St. David's states it has been irreparably injured through the loss of existing members, the loss of potential members, the decreased worship experience of some of its members, reputational injury, and injury from the potentially violent atmosphere of the picketing locality. The nature of these injuries is such that St. David's does not have "a full, complete, and adequate remedy at law through recovery of calculable money damages." *Wichita Wire*, 11 Kan. App. 2d at 465. Westboro has failed to show error on this point.

## Threatened injury outweighed damage

Westboro contends the temporary injunction unduly infringes its First Amendment rights of freedom of speech and religion.

The parties agree to the application of the recent United States Supreme Court decision in *Madsen v. Women's Health Center*, 512 U.S. 753, 129 L. Ed. 2d 593, 114 S. Ct. 2516 (1994), but dispute the effect of applying *Madsen* to the present case. In *Madsen*, the Court addressed the constitutionality of an injunction which cre-ated a buffer zone around an abortion clinic and around the resi-dences of clinical staff. The Court began by addressing whether the injunction restricted the content of the protesters' speech:

"Our principal inquiry in determining content neutrality is whether the gov-ernment has adopted a regulation of speech 'without reference to the content of the regulated speech.' [Citations omitted.] We thus look to the government's pur-pose as the threshold consideration. . . . [T]he fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based." 512 U.S. at 763.

The express purpose of the temporary injunction in this case was to thwart potential violence around St. David's property during specific times of the day when prior encounters between the two groups occurred. The trial court also expressly stated it was not yet

ruling upon whether the content of Westboro's message would be further restricted until after hearing evidence on the matter. The injunction imposed in this case, therefore, is content neutral.

In evaluating a content-neutral injunction, *Madsen* held that the proper test is "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." 512 U.S. at 765. In so holding, the Court rejected the application of a strict scrutiny analysis to evaluate a content-neutral injunction. 512 U.S. at 764-67.

*Madsen* further upheld a combination of government interests used by the Florida Supreme Court as "quite sufficient to justify an appropriately tailored injunction to protect them." 512 U.S. at 768. Many of those interests apply in the present case as well, including the State of Kansas' strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens. See 512 U.S. at 764-66. Also, as noted by the trial court in its injunction, an additional important government interest at stake here is the right to worship one's religion without infringement. See Kan. Const. Bill of Rights, § 7.

In addition to the government interests cited in *Madsen*, does the government have a further interest in protecting the property at issue because it is a place of religious worship for the members of St. David's?

The recent Supreme Court cases involving focused picketing have noted a special government interest in protecting residential privacy to uphold restrictions upon the focused picketing of an individual's home. See *Madsen*, 512 U.S. at 768; *Frisby v. Schultz*, 487 U.S. 474, 484-85, 101 L. Ed. 2d 420, 108 S. Ct. 2495 (1988). In *Madsen*, the court went even further and upheld the Florida Supreme Court's finding that the government had an interest in protecting an abortion clinic's property from targeted picketing because targeted picketing threatens both the psychological and physical well-being of the clinic's patients. 512 U.S. at 767-68.

After noting the government interest in protecting residential privacy which has been upheld by the United States Supreme

Court, the trial court in this case ruled that one's place of worship "would place a close second to one's residence when it comes to the right to worship and communicate with the maker of one's choice in a tranquil, private and serene environment."

We agree with the trial court and find that, in addition to the government interest in protecting residential and clinical privacy, the government has a legitimate interest in protecting the privacy of one's place of worship as well. This interest does not flow directly from the right of free exercise of religion found in the First Amendment to the United States Constitution and Section 7 of the Bill of Rights of the Kansas Constitution. Those constitutional provisions safeguard the free exercise of religion from governmental interference. However, the right of free exercise would be a hollow one if the government could not step in to safeguard that right from unreasonable interference from another private party.

In discussing the time, place, and manner restrictions that may be placed upon free speech, the United States Supreme Court has noted that "religious worship may not be disturbed by those anxious to preach a doctrine of atheism." *Kovacs v. Cooper*, 336 U.S. 77, 86, 93 L. Ed. 513, 69 S. Ct. 448 (1949). More broadly stated to apply here, one's religious worship may not be unduly disturbed by another anxious to preach a different religious or social philosophy.

The trial court here also found that the temporary injunction was warranted because of harassment and threats of violence and injury surrounding the picketing of St. David's by Westboro. The court reasoned the climate was particularly volatile in light of the fact that children were accompanying their parents to the religious services at St. David's and that these parents would tolerate less harassment when accompanied by their children than otherwise. The court also noted that the constitutional limits of Westboro's speech would be lessened given the fact that children were routinely part of the audience which was subjected to Westboro's speech. However, the court deferred a determination of whether the speech employed by Westboro fell within the First Amendment's protection until an evidentiary hearing could be held.

Because an evidentiary hearing has not been held nor findings made, this court is not in a position to determine whether Westboro's speech was constitutionally protected. However, we can address the legal question raised by the trial court: Is the speech employed by Westboro in its focused picketing afforded less constitutional protection because children routinely are part of the audience?

St. David's cites three United States Supreme Court cases to support its position that the government has an added interest in protecting children from objectionable speech: *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 92 L. Ed. 2d 549, 106 S. Ct. 3159 (1986), *FCC v. Pacifica Foundation*, 438 U.S. 726, 57 L. Ed. 2d 1073, 98 S. Ct. 3026, *reh. denied* 439 U.S. 883 (1978), and *Ginsberg v. New York*, 390 U.S. 629, 20 L. Ed. 2d 195, 88 S. Ct. 1274, *reh. denied* 391 U.S. 971 (1968). In general, these cases show that, depending upon the context, the government does have an interest in protecting children from objectionable speech beyond the interest it has in protecting adults from the same speech.

*Fraser* and *Ginsberg* are less·helpful to resolve the current issue because, unlike the audience which is subject to Westboro's speech in the present case, the audiences subject to the speech in *Fraser* and *Ginsberg* were solely or primarily children.

In *FCC*, the Court recognized a government interest in protecting minors from exposure to vulgar or offensive spoken language. The case arose following the broadcast of comedian George Carlin's 12-minute monologue entitled "Filthy Words." The FCC issued an order condemning the local station which broadcast the monologue, and the order was challenged in court. On appeal, the United States Supreme Court, in considering the constitutionality of the FCC's order, addressed "whether a broadcast of patently offensive words dealing with sex and excretion may be regulated because of its content." 438 U.S. at 745.

The Court noted that the patently offensive words at issue in *FCC* were "not entirely outside the protection of the First Amendment," 438 U.S. at 746, but nonetheless "the constitutional protection accorded to a communication containing such patently of-

fensive sexual and excretory language need not be the same in every context." 438 U.S. at 747.

The Court upheld the FCC order as constitutional and, in doing so, relied upon two basic reasons. First, the Court found that the nature of the broadcast medium was such that offensive material "confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." 438 U.S. at 748. Second, the court found broadcasting "uniquely accessible to children," 438 U.S. at 749, in contrast to other forms of offensive expression which may be withheld from children without restricting the expression at its source, *e.g.*, indecent literature and movies.

Although the *FCC* Court emphasized that its holding was a narrow one, the very same reasons for upholding the restriction of speech in *FCC* are present here. The attending of worship services by members of St. David's involves a public and private exercise— public in the sense that the members must naturally travel through and amid public property to get to their church (*i.e.*, the setting giving rise to the current lawsuit involves a traditional public forum), and private in the sense that the members are engaging in private devotion (*i.e.*, as already recognized earlier, there is a government interest in protecting the privacy of St. David's place of worship).

In addition, the times of day affected by the trial court's injunction—immediately before, during, and immediately after a religious event—are times when children are routinely part of the audience which is subject to Westboro's verbal barrage. As in *FCC*, although there is language and expression which Westboro could lawfully use where adults alone made up the audience, the same cannot be said where the audience involves a mixture of adults and children. Importantly, as in *FCC*, the audience cannot be otherwise separated out so that the children are not subject to the objectionable speech, absent requiring the children to remain home, which would be an obvious assault upon their free exercise of religion.

In short, the trial court did not err when it found that the standard for judging the constitutionality of Westboro's speech is such

that it may be narrowly tailored to suit both adults and children during the effective times of the injunction.

On the whole, the combination of these government interests and those cited in *Madsen* is sufficient to justify an appropriately tailored injunction to protect them.

Throughout its brief, Westboro challenges some of these justifications by the trial court, stating that there was no threat of violence and no obstruction of vehicle or pedestrian traffic. This court's retention of this appeal was largely based on Westboro's assurance in its response to the show cause order that further hearings by the trial court would not contribute to the evidentiary record now before the court. Thus, Westboro's opportunity to challenge the trial court's findings concerning the government interests at stake in this case have been foreclosed by its own desire for an appeal of the trial court's order.

The next question is whether the injunction burdens no more speech than necessary to serve the government interests at stake. The trial court imposed a buffer zone within which Westboro is prohibited from engaging in focused picketing from a period beginning one-half hour before and ending one-half hour after a religious event. The zone extends 36 feet to the east, 36 feet to the west, 36 feet to the north, and 215 feet to the south of St. David's church property.

Westboro argues that, even if the injunction is upheld, the trial court's buffer zone burdens more speech than is necessary to carry out the government interests at stake. St. David's requests this court to reform the trial court's buffer zone to extend 100 feet from its property in all directions and to impose other restrictions not imposed by the trial court.

Unfortunately, because of the posture of this case and the lack of findings by the trial court, it is impossible for this court to determine whether the court's buffer zone requires reformation. The cases cited by the parties which have upheld various buffer zone distances, while relevant, are not determinative in any way because injunction cases, like the present one, are extremely fact specific depending upon the physical nature of the area involved. What is desperately needed in this case is an evidentiary hearing to deter-

mine whether the buffer zone falls short of, satisfies, or exceeds its stated purpose. The parties would apparently have this court take judicial notice of what has been going on at 17th and Gage Streets for the past 1 and ½ years.

Westboro also fails to explain why the other avenues of expression left open by the injunction as it currently exists—the limited picketing allowed by the order, picketing elsewhere, mailings, leaflets, etc.—give it insufficient other means to communicate its message. Based upon the record that is before this court, we affirm the court's buffer zone with specific directions on remand that, if the court decides to impose a permanent injunction, it should make findings concerning the appropriateness of whatever distances the court ultimately imposes.

We do have a problem with the court's order proscribing noise contained in the third paragraph of its injunction order. The United States Supreme Court has upheld as constitutional some noise restrictions related to picketing activity. See *Madsen*, 512 U.S. at 772-73. As Westboro points out, however, there is nothing in the affidavits which accompanied St. David's petition which suggests that the noise from Westboro's picketing activity was interfering with the worshipping by St. David's. Although the petition did request an injunction on such noise, St. David's has yet to provide the trial court, or this court, with any basis for such an injunction. On the present record, we reverse the trial court's order enjoining noise by Westboro.

As a final matter under this issue, Westboro would like for this court to resolve the question of whether a court can enjoin picketing outside of a church on public sidewalks. St. David's argues that this issue was not considered by the trial court and should not be considered on appeal.

Westboro's arguments on this issue seem to presume that its speech is constitutionally protected, an issue expressly left open by the trial court. Any ruling by this court on this issue, therefore, would be advisory in nature.

## Adverse to public interest

Westboro makes no showing that the court's order is adverse to

the public interest other than its general arguments concerning preservation of freedom of speech. As noted already, however, injunctions of picketing activity have often been upheld against First Amendment challenges where the burden on the speech is outweighed by the need for protection from the picketing activity. See, e.g., *Madsen v. Women's Health Center*, 129 L. Ed. 2d 593; *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 431 S.E.2d 828, *rev. denied* 335 N.C. 175 (1993), *cert. denied* 129 L. Ed. 2d 894 (1994). In these types of cases, the public's interest is better served when the freedom to speak is not completely unfettered.

In sum, the four prerequisites for a temporary injunction having been met, Westboro has failed to meet its burden of showing the trial court abused its discretion by issuing the temporary injunction.

Next, Westboro contends the assigned judge erred in ruling that the affidavit supporting its motion for a change of judge was legally insufficient. The assigned judge denied a similar motion in the portion of this case that involves the contempt proceedings against Fred and Margie Phelps.

The sufficiency of an affidavit filed pursuant to K.S.A. 20-311d is a matter of law over which this court has unlimited review. *State v. Clothier*, 20 Kan. App. 2d 994, 995, 894 P.2d 257 (1995).

As a preliminary matter, St. David's argues Westboro failed to timely appeal the order which ruled that its affidavit was insufficient. Although St. David's suggests that the order denying the motion to change judge was immediately appealable, it provides no authority for this proposition. There was no certification of Westboro's change of judge claim under K.S.A. 60-254(b). Westboro's appeal from this order is as timely as the rest of the appeal.

Westboro argues the district court erred in ruling the affidavit failed to show that Judge Barbara lacks impartiality. Westboro is most concerned about Judge Barbara's signature on a petition which appeared in the local Topeka newspaper over a year before the filing of the present lawsuit. The petition, restated here for convenience, states:

"We, the undersigned, offer witness of our belief that all people have the right to live in dignity, in safety and in privacy, regardless of age, gender, race, ethnicity,

religious preference or sexual orientation. We embrace love rather than hate; safety rather than endangerment, respect rather than harassment. Our commitment to these beliefs compels us to create a community that promotes these values." .

In *State v. Griffen*, 241 Kan. 68, Syl. ¶ 5, 734 P.2d 1089 (1987), the court announced:

"The standard to be applied to a charge of lack of impartiality is whether such charge is grounded on facts that would create reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances."

The reviewing judge, as well as the appellate court, passes only on the legal sufficiency of the affidavit and not on the truth of the facts alleged. *State v. Clothier*, 20 Kan. App. 2d at 996.

Our Supreme Court stated in *State v. Foy*, 227 Kan. 405, 411, 607 P.2d 481 (1980):

"The rule generally followed throughout the United States is that the words "bias" and "prejudice," as used in connection with the disqualification of a judge, refer to the mental attitude or disposition of the judge toward a party to the litigation and not to any views that he might entertain regarding the subject matter involved. Bias and prejudice mean a hostile feeling or spirit of ill will against one of the litigants, or undue friendship or favoritism toward one. [Citations omitted.] K.S.A. 20-311d(b)(5) specifies that personal bias, prejudice, or interest is ground for disqualification. This requires antagonism and animosity toward the affiant or his counsel or favoritism towards the adverse party or his counsel. *"Personal bias" is to be distinguished from "judicial bias," and does not include views based* upon matters arising during the course of the litigation or *upon general attitudes common to the public generally."* (Emphasis added.)

See 46 Am. Jur. 2d, Judges §§ 146-56, 160-65.

*Foy* can be distinguished in the sense that there is no indication the trial court in that case was targeting the defendant when he made his comments concerning indigent defendants. Here, although the petition signed by Judge Barbara does not expressly identify Westboro or any of its members as its target, Westboro asserts it is obvious the petition was directed toward its picketing activity. However, like in *Foy*, the principles espoused by signers of the petition here are general in nature. Moreover, the principles stated in the petition signed by Judge Barbara are principles en-

tirely opposite from those required for a finding of bias or prejudice, namely, hostile feelings or a spirit of ill will.

The remainder of the issues relating to the lack of impartiality were well addressed in the assigned judge's order. There are sufficient grounds to support the trial court's finding that the affidavit was insufficient as a matter of law.

However, there still remains the fact that Westboro's picketing has been and continues to be the focus of much attention in the community, and Judge Barbara's signature was on a petition which, as asserted by Westboro, was directed toward its picketing activity. Therefore, on remand, given that courts must strive to avoid "even the appearance" of bias, we conclude that another judge should be assigned for further proceedings.

Finally, Westboro contends the court erred in failing to require a bond before issuing the restraining order pursuant to K.S.A. 60-903(a).

St. David's argues Westboro has failed to preserve this issue. As St. David's points out, there is nothing in the record on appeal to suggest that Westboro raised this point before the trial court. "[A] point not presented to the trial court will not be considered for the first time on appeal." *Plummer Development, Inc. v. Prairie State Bank*, 248 Kan. 664, Syl. ¶ 3, 809 P.2d 1216 (1991).

In addition, the language of K.S.A. 60-903(a) indicates the decision whether to require a bond for a restraining order lies within the sound discretion of the trial court. Westboro makes no showing of an abuse of discretion here other than a general suggestion that no restraining order involving a First Amendment concern should be issued without a bond.

Affirmed in part, reversed in part, and remanded for further proceedings.