No. 74,690

WILLIAMS NATURAL GAS COMPANY, *Appellee*, v. SUPRA ENERGY, INC., and SUPRA ENERGY, L.L.C., *Appellants.*

931 P.2d 7

Opinion filed January 31, 1997.

*Lee Thompson*, of Triplett, Woolf, & Garretson, L.L.P., of Wichita, argued the cause, and *Nancy J. Strouse*, of the same firm, was with him on the briefs for appellant Supra Energy, Inc.

*Teresa J. James*, of Adams, Jones, Robinson & Malone, Chtd., of Wichita, argued the cause and was on the brief for appellee Williams Natural Gas Company.

*Ann T. Rider*, of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, was on the brief for *amicus curiae* Northern Natural Gas Company.

The opinion of the court was delivered by

LARSON, J.: This case presents a limited question of the proper grant of a temporary injunction based on the constitutionality of several specific provisions of K.S.A. 55-1210, which relate to testing to determine if natural gas has migrated outside an underground storage field. The statute was enacted in 1993 and has not previously been challenged on appeal. In this appeal we address the narrow issue of the constitutionality of the testing provisions found in K.S.A. 55-1210(c)(2) and (3) and the right to injunctive relief allowed by K.S.A. 55-1210(d).

Defendants Supra Energy, Inc., and Supra Energy, L.L.C. (Supra) appeal from an order granting a temporary injunction which permitted Williams Natural Gas Company (WNG) to conduct testing on Supra's gas wells located on property adjacent to WNG's storage field. The trial court determined K.S.A. 55-1210 authorized the injunction. We have jurisdiction under K.S.A. 20-3018(c).

WNG is a natural gas company operating under the Natural Gas Act, 15 U.S.C. 717 et seq. (1994), which maintains a natural gas storage field, the "Elk City Storage Field," in Elk, Montgomery, and Chautauqua Counties in Kansas. This storage field is an integral part of WNG's interstate natural gas pipeline system, in which substantial amounts of gas are injected, stored, and withdrawn. The field is formed by an underground stratum called the "Burgess Sand" formation.

Supra is a lessee of property in Elk County on which it has developed several oil and gas wells. WNG first became aware of Supra through a letter in April 1992, in which Supra informed WNG that it had a new "field [of] discovery," with a well (the Cindy well) located approximately .6 mile from the northwestern corner of WNG's storage field boundary. In the letter, Supra provided a gas analysis and requested specifications for a tap onto a WNG pipeline. Although representatives from Supra and WNG met to discuss possible tap sites, the companies never entered into a final tap agreement, and WNG formally denied Supra's tap request in March 1994. Relying on the 1992 Cindy well gas analysis report, WNG told Supra that the reason for the denial was not based on a suspicion that Supra was producing WNG's storage gas.

Since the summer of 1994, Supra has drilled at least seven additional wells in sections 3, 10, and 15 of Township 31 South, Range 13 East, Elk County, Kansas, all sections adjacent to WNG's storage field. By March 1995, WNG became concerned that Supra was producing gas from its storage field. Records from the Kansas Department of Revenue indicated Supra's gas production exceeded 250,000 MCF for November 1994 through February 1995, when total production in Elk County for all of 1994, excluding Supra's, was only about 150,000 MCF. WNG believed Supra's production was extremely abnormal from shallow wells in southeast Kansas. Other grounds for concern included the close proximity of the wells to the storage field, geological evidence of the northwesterly trend of the storage field in the direction of Supra's productive wells, and similarities between recent pressure test information on the wells of both parties.

In order to obtain additional information, WNG sent Supra a series of five letters between March and May 1995, requesting permission to conduct testing on Supra's wells. Supra responded with three letters essentially requesting a negotiated agreement for reciprocal testing performed by an independent third party paid for by WNG, proof of insurance to cover incidents caused by the testing, and provision for expenses incurred by Supra as a result of the testing. Supra also insisted that WNG add a tracer substance to its injected gas. Unable to reach a voluntary agreement, WNG filed for an injunction pursuant to K.S.A. 55-1210(d) and K.S.A. 60-901 on June 2, 1995.

The trial court heard WNG's motion for temporary injunction on June 15, 1995. WNG presented the testimony of Tom Cook, a WNG geologist. Supra called Ronald Cook, a petroleum engineer, to testify. (Since both last names are Cook, we refer to them by first name.) Tom identified the locations of wells Supra had drilled on a map, one of which was 330 to 335 feet from the boundary of the storage field. He then described the northwesterly trend of the storage formation and claimed the Supra wells were producing from the Burgess Sand rather than the Mississippi Chat formation. Tom said the amount of production from the Supra wells was ab-

normal and stated available pressure test results from Supra and WNG wells were similar.

Tom then described the four types of tests that WNG proposed in their petition: gas samples, meter runs, pressure records, and chromatographs. Installation of the meter runs would not affect production for longer than one day, and the other tests would not affect production at all. Tom stated gas ownership would primarily be determined through chromatographs of the gas samples, but the meter runs and the pressure records would monitor the flow rates and the pressure to determine if there is communication between the wells and the storage field. Tom believed that conducting all the tests would insure no room for error.

Ronald had participated in a well study on Supra's leases in February 1994 and, based on his reading of geological studies, concluded that the reserves contained native gas and were producing from the Mississippi Chat formation. While commenting upon the various tests proposed by WNG, Ronald acknowledged that gas samples are important, but claimed pressure tests are unreliable and the use of tracers is an accepted method of testing in the industry. Ronald admitted, "The more data you have the better." Finally, he asserted that the wells' proximity to the storage field would not matter if Supra was producing gas from a separate source of supply.

After this testimony, the trial court found the involved provisions of K.S.A. 55-1210 were constitutional and within the legislative prerogative. The court held that WNG had met its burden of proof for obtaining a temporary injunction and granted the injunction, deciding that all four proposed tests were reasonable. Noting that the statute spoke to "adjoining lands," not adjoining leases, the court concluded that the wells on sections 3, 10, and 15 all adjoined the storage field. WNG was ordered to share the results of its tests with Supra, as well as test results from its own storage field.

Supra appealed. We affirm.

*Are the portions of K.S.A. 55-1210 permitting the testing to determine whether natural gas has migrated outside an underground storage field and the issuance of the injunction constitutional?*

We first set forth K.S.A. 55-1210 in its entirety, although the principal arguments in this appeal relate to (c)(2), (3), and (d):

"(a) All natural gas which has previously been reduced to possession, and which is subsequently injected into underground storage fields, sands, reservoirs and facilities, whether such storage rights were acquired by eminent domain or otherwise, shall at all times be the property of the injector, such injector's heirs, successors or assigns, whether owned by the injector or stored under contract.

"(b) In no event shall such gas be subject to the right of the owner of the surface of such lands or of any mineral interest therein, under which such gas storage fields, sands, reservoirs and facilities lie, or of any person, other than the injector, such injector's heirs, successors and assigns, to produce, take, reduce to possession, either by means of the law of capture or otherwise, waste, or otherwise interfere with or exercise any control over such gas. Nothing in this subsection shall be deemed to affect the right of the owner of the surface of such lands or of any mineral interest therein to drill or bore through the underground storage fields, sands, reservoirs and facilities in such a manner as will protect such fields, sand, reservoirs and facilities against pollution and the escape of the natural gas being stored.

"(c) With regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased:

(1) The injector, such injector's heirs, successors and assigns shall not lose title to or possession of such gas if such injector, such injector's heirs, successors or assigns can prove by a preponderance of the evidence that such gas was originally injected into the underground storage.

(2) The injector, such injector's heirs, successors and assigns, shall have the right to conduct such tests on any existing wells on adjoining property, at such injector's sole risk and expense including, but not limited to, the value of any lost production of other than the injector's gas, as may be reasonable to determine ownership of such gas.

(3) The owner of the stratum and the owner of the surface shall be entitled to such compensation, including compensation for use of or damage to the surface or substratum, as is provided by law, and shall be entitled to recovery of all costs and expenses, including reasonable attorney fees, if litigation is necessary to enforce any rights under this subsection (c) and the injector does not prevail.

"(d) The injector, such injector's heirs, successors and assigns shall have the right to compel compliance with this section by injunction or other appropriate relief by application to a court of competent jurisdiction."

The question on appeal before this court is whether the trial court properly granted the temporary injunction. Therefore, we need only decide whether the provisions of K.S.A. 55-1210 granting gas injectors the right to test adjoining wells and to obtain

injunctive relief are constitutional and able to stand independent of the rest of the statute. If these provisions are severable, we should and need not decide whether the rest of the statute is unconstitutional. See *State v. Rupert*, 247 Kan. 512, 515, 802 P.2d 511 (1990), where we held: "It is generally recognized that, where unconstitutional parts of a statute can be readily separated from the remainder of the statute without affecting the meaning of what remains, the unconstitutional language will be stricken and the constitutional portion will stand."

The constitutionality of a statute is a question of law. The standard of review on a question of law is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991). "[A] statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down." *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992). We have also stated:

"The court does not sit in judgment on the merits of such legislation. If the statute here challenged does not contravene significant constitutional or inherent rights of individuals, if the classification on which it is based is reasonable, if it is within the scope of the police powers of the state, if it is appropriately related to a proper purpose of such police power, the statute is not to be invalidated by the judicial arm of government." *City of Wichita v. White*, 205 Kan. 408, 409, 469 P.2d 287 (1970).

Supra first argues that the testing provisions of the statute are not severable because there would be no reason to allow testing if the remainder of the statute were struck down. Logic refutes Supra's position. The testing provisions would be even more essential if we found the rest of the statute unconstitutional, because if injectors of migrating natural gas could not retain title to their gas, they would have a greater need to ascertain whether their gas was migrating. Injectors need the information provided by the testing in order to prevent further gas migration or to determine if it is necessary to condemn surrounding property. Further, even if we were to strike all the language in K.S.A. 55-1210(a), (b), and (c)(1),

the portions remaining in (c)(2), (3), and (d) could stand alone and form a meaningful statute.

Supra makes several constitutional arguments that this statute, as a whole, violates due process because it was adopted for a private, not a public interest. This is contrary to the specific language of K.S.A. 55-1202, which states:

> "The underground storage of natural gas which promotes conservation thereof, which permits the building of reserves for orderly withdrawal in periods of peak demand, which makes more readily available our natural gas resources to the domestic, commercial and industrial consumers of this state, and which provides a better year-round market to the various gas fields, promotes the public interest and welfare of this state."

The statute has a reasonable public purpose, clearly expressed by the legislature.

Supra next alleges that the statute is unconstitutionally vague. In *Boatright,* we held: "'A common-sense determination of fairness is the standard for determining whether a statute regulating business is unconstitutional for vagueness, *i.e.*, can an ordinary person exercising common sense understand and comply with the statute? If so, the statute is constitutional.'" 251 Kan. at 243.

Supra first contends that "injector" is not defined and it could be held to mean anyone who injects gas, regardless of whether they are a natural gas storage company or have an approved storage site. This argument is without merit. There is nothing unconstitutional about permitting anyone to be considered an injector for purposes of K.S.A. 55-1210. The statute does not give injectors a right to condemn property, nor do the testing provisions constitute a taking of property by injectors.

Supra further alleges that the term "adjoining" is vague. The trial court held that "adjoining" was any section adjacent to a storage field. Therefore, any section of land which touched a section containing a storage field was adjoining. This conforms to our holding in *State, ex rel., v. Bunton,* 141 Kan. 103, Syl. ¶ 1, 40 P.2d 326 (1935), where "adjoining" had its "usual and ordinary meaning, that of being contiguous or touching." Clearly a person exercising common sense would understand the term "adjoining" in this statute.

Supra finally asserts that the "testing" provision is invalid due to vagueness because what is found to be "reasonable to determine ownership" in courts of one part of the state may be different than in other parts. Supra's position is untenable. District courts are capable of making factual determinations based on the evidence submitted as to what is reasonable in each situation.

Supra offers no compelling reasons or authority for us to find that the testing provisions of K.S.A. 55-1210 are unconstitutional. These provisions do not violate the constitution. We uphold as constitutional the specific provisions of K.S.A. 55-1210(c)(2), (3), and (d).

*Did the district court abuse its discretion by granting a temporary injunction permitting WNG to conduct testing on Supra's gas wells pursuant to K.S.A. 55-1210?*

The standard of review on appeal from an order granting a temporary injunction is whether the trial court manifestly abused its discretion. *Comanche Country Hospital v. Blue Cross of Kansas, Inc.*, 228 Kan. 364, Syl. ¶ 2, 613 P.2d 950 (1980).

"Judicial discretion is abused if it is arbitrary, fanciful, or unreasonable, which is another way of stating that discretion is abused only if no reasonable person would take the view adopted by the trial court. If reasonable persons could differ regarding the propriety of the action taken by the trial court, it cannot be said that the trial court abused its discretion." *Labette Community College v. Board of Crawford County Comm'rs*, 258 Kan. 622, 625, 907 P.2d 127 (1995).

On review of a grant of a temporary injunction, we should examine the record only to determine if any reasonable grounds support the action of the district court; if there were, we should affirm the grant. *Comanche*, 228 Kan. at 367.

Supra contends that because the temporary injunction granted in this case was actually no different than the final relief sought, it should have been given additional opportunity to challenge the basis on which WNG sought the temporary injunction. This point is not well taken. Before deciding whether to grant the temporary injunction, the court held a hearing, where both sides presented expert testimony and both sides argued before the court. The injunction, which preserved evidence of the status quo at the wells,

was only in place about 180 days and did not eliminate WNG's need to sue to protect its ownership rights under K.S.A. 55-1210. Because the order at issue was only a temporary injunction, Supra was not entitled to a full trial on the merits. It is further clear that Supra received due process before the temporary injunction was issued.

Four prerequisites must be met before a moving party may obtain a temporary injunction:

"(1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, will not be adverse to the public interest." *St. David's Episcopal Church v. Westboro Baptist Church, Inc.,* 22 Kan. App. 2d 537, 543-44, 921 P.2d 821 (1996).

Of these elements on appeal, Supra only challenges WNG's showing of irreparable injury. There is evidence in the record to indicate that WNG could suffer irreparable injury if the injunction were not granted. First, evidence indicated that immediate testing, in light of imminent gas injection, would help best determine whether Supra was producing WNG's gas. Second, WNG alleged that Supra would be unable to compensate WNG if it were eventually determined that Supra had been producing WNG gas and owed damages. Third, WNG presented evidence that it had not delayed upon discovery that Supra may be producing its gas.

The trial court found WNG had met the burden of proof for obtaining a temporary injunction. We find no abuse of discretion in this decision.

Supra also contends that WNG lacked the clean hands required to obtain injunctive relief. This contention is meritless. The record provides no support for finding WNG knew or should have known prior to 1995 that Supra may be producing WNG gas. Nor is there evidence that WNG delayed after discovering Supra may be producing its gas. Other reasons alleged by Supra as to why WNG should have been denied relief are not properly before us. These claims have not yet been adjudicated below. Additionally, Supra's argument that WNG is a trespasser and should not have been af-

forded relief is spurious. The whole point of the injunction was to determine whether WNG's gas was "trespassing." We do not find the district court abused its discretion in deciding that WNG was entitled to equitable relief pursuant to the statute.

Supra also again challenges the trial court's interpretation of the statute and its application to this injunction. Supra alleges the tests ordered by the injunction were not "reasonable to determine ownership of the gas" and were not on "adjoining" property.

The trial court heard evidence that utilization of all the tests would best help determine ownership of the gas and that the tests would not significantly affect Supra's production or endanger Supra's wells. The trial court did not abuse its discretion in finding the testing was reasonable.

We have previously stated the trial court properly defined "adjoining." Thus, its determination that Supra's wells were on "adjoining property" is supported by the evidence and is not an abuse of discretion.

Supra finally argues that WNG should not be allowed to invoke the provisions of K.S.A. 55-1210 because it has not availed itself of the Kansas statutory scheme for approval of a gas storage facility underlying Supra's land. The plain language of the statute refutes Supra's position. K.S.A. 55-1210(c) specifically indicates that it applies regardless of whether other statutes of the Underground Storage of Natural Gas Act, K.S.A. 55-1201 *et seq.*, have been complied with. It begins: "With regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, *which has not been condemned as allowed by law or otherwise purchased.*" (Emphasis added.)

It would not make sense to require injectors like WNG to go to the expense of certificating and acquiring neighboring land where it suspects gas has escaped from its storage place in order to invoke the testing provisions of a statute designed to help an injector know whether gas is escaping. Supra's suggested interpretation of K.S.A. 55-1210 is unreasonable and must be disregarded.

*Is K.S.A. 55-1210 constitutional in its entirety, and does it deprive Supra of vested rights?*

Supra attempts to have us consider K.S.A. 55-1210 in its entirety, thereby asking us to give an advisory opinion and answer questions not properly before us. This we will not do. See *Sheila A. v. Finney*, 253 Kan. 793, 796, 861 P.2d 120 (1993).

In *State, ex rel., v. Fairmont Foods Co.*, 196 Kan. 73, 77, 410 P.2d 308 (1966), we stated: "Another proposition of law frequently expressed is that the court will not consider the constitutionality of a statute in any particular not necessarily involved to a decision." We have found that the testing provisions are constitutional, and we need go no further to uphold the trial court's decision issuing the injunction.

Supra also argues the statute deprives it of vested property rights without due process of law. However, Supra has made no showing that issuance of the temporary injunction under the statute has taken any of Supra's property rights. All arguments as to how the other provisions of the statute involve an unconstitutional taking are not ripe for review.

Affirmed.