**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 17, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

NORTHERN NATURAL GAS
COMPANY,

      Plaintiff – Counter-Defendant -
Appellee,

v.

L.D. DRILLING, INC.; BILL R.
MILTON; CARL DUDREY; HJB, INC.;
IVAN W. MILTON; KIM B.
SHOEMAKER; L.D. DAVIS; LARRY E.
KEENAN; LISA M. MILTON; NANCY
H. SHOEMAKER; PAUL J. BEAVER;
TAMMY MILTON; TIMOTHY R.
KEENAN; WHITETAIL ENERGY,
INC.,

      Defendants – Counter-Claimants -
Appellants,

and

STEVEN EUGENE YOUNG,

      Counter-Claimant – Appellant.

No. 11-3024

ALLAM EXPLORATION, LLC.;
APOLLO ENERGIES, INC.; ROBERT P.
BAYER, II; DALE L. SMITH and MAE

D. SMITH, Revocable Trust dated 12/05/2007; ERIC D. STINTON, Trust dated 1/25/2007; DALE L. SMITH, MAE D. SMITH, ERIC D. STINTON, Trustees; JOHN P. HASTINGS; LIES EXPLORATION, LLC; DAVID MUNRO; NASH OIL & GAS, INC.; BRENDA M. RIFFEY; LARRY D. RIFFEY; VAL ENERGY, INC; VISION INVESTMENTS, LLC; VOSBURGH EXPLORATION, LLC; STEVEN EUGENE YOUNG,

       Defendants – Counter-Claimants.

---

NORTHERN NATURAL GAS COMPANY,

       Plaintiff – Counter-Defendant - Appellee,

v.

NASH OIL & GAS, INC.,

       Defendant – Counter-Claimant – Appellant,

and

ALLAM EXPLORATION, LLC.; APOLLO ENERGIES, INC.; ROBERT P. BAYER, II; PAUL J. BEAVER; DALE L. SMITH AND MAE D. SMITH, REVOCABLE TRUST DATED 12/05/2007; ERIC D. STINTON TRUST

No. 11-3026

DATED 1/25/2007; DALE L. SMITH, MAE D. SMITH, ERIC D. STINTON, Trustees; HJB, INC.; JOHN P. HASTINGS; LARRY E. KEENAN; TIMOTHY R. KEENAN; L.D. DRILLING, INC.; LIES EXPLORATION, LLC; BILL R. MILTON; IVAN W. MILTON; LISA M. MILTON; TAMMY MILTON; DAVID MUNRO; BRENDA M. RIFFEY; LARRY D. RIFFEY; KIM B. SHOEMAKER; NANCY H. SHOEMAKER; VAL ENERGY, INC.; VISION INVESTMENTS, LLC; VOSBURGH EXPLORATION, LLC; WHITETAIL ENERGY, INC.,

Defendants – Counter-Claimants.
_____

STEVEN EUGENE YOUNG,

Counter-Claimant.

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. Nos. 6:08-CV-01400-WEB-DWB,**
**6:08-CV-1405-WEB-DWB)**

_____

Jim H. Goering of Foulston Siefkin LLP, Wichita, Kansas, and Brian J. Madden, Wagstaff & Cartmell, LLP, Kansas City, Missouri (Adam S. Davis, Wagstaff & Cartmell, LLP, Kansas City, Missouri, and Timothy B. Mustaine, Foulston Siefkin LLP, Wichita Kansas, with them on the briefs) for Defendants-Appellants.

3

Richard A. Olmstead, Kutak Rock LLP, Wichita, Kansas (Corey A. Neller, Mark D. Coldiron, and Paula M. Jantzen, Ryan Whaley Coldiron Shandy PLLC, Oklahoma City, Oklahoma, with him on the brief) for Plaintiff-Appellee.

---

Before **HOLMES, EBEL,** and **MATHESON,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In these consolidated interlocutory appeals, Defendants-Appellants, natural gas producers with wells in south central Kansas, challenge a preliminary injunction enjoining them from further gas production from those wells. The district court entered the preliminary injunction after concluding there was a substantial likelihood that Plaintiff-Appellee Northern Natural Gas Co. ("Northern") will prevail on its state-law claim alleging that Defendants' natural gas production from these wells is an actionable nuisance because it is disrupting Northern's nearby underground storage of natural gas. Having jurisdiction under 28 U.S.C. § 1292(a)(1), we AFFIRM.

## I. BACKGROUND

### A. Regulation of natural gas generally

Before addressing the issues presented by these appeals, we mention briefly the manner in which natural gas production and storage is regulated. Both state and federal governments regulate the natural gas industry. See Nw. Cent. Pipeline Corp. v. State Corp. Comm'n, 489 U.S. 493, 506 (1989). Congress, through the Natural Gas Act of 1938 ("NGA"), 15 U.S.C. §§ 717-717z, vests the Federal Energy Regulatory

4

Commission ("FERC") with exclusive jurisdiction over sales of natural gas in interstate commerce for resale and transportation of natural gas, as well as over natural gas companies engaged in those activities. See 15 U.S.C. § 717(b); see also Fuel Safe Washington v. FERC, 389 F.3d 1313, 1317 (10th Cir. 2004). See generally Cascade Natural Gas Corp. v. FERC, 955 F.2d 1412, 1421 (10th Cir. 1992) ("It is settled that if the NGA grants jurisdiction to [FERC] over a matter, . . . its jurisdiction is exclusive."). Relevant here, FERC's exclusive jurisdiction over interstate transportation of natural gas also includes jurisdiction over the storage of natural gas. See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 295 n.1 (1988) (agreeing that "[u]nderground gas storage facilities are a necessary and integral part of the operation of piping gas from the area of production to the area of consumption") (internal quotation marks omitted).

"Prior to constructing or operating any natural gas pipeline and related facilities, a company subject to FERC's jurisdiction must obtain from FERC 'a certificate of public convenience and necessity,' 15 U.S.C. § 717f(c)(1)(A), indicating . . . the proposed service 'is or will be required by the present or future public convenience or necessity.' 15 U.S.C. § 717f(e)." Fuel Safe, 389 F.3d at 1317; see also Schneidewind, 485 U.S. at 302. Once a natural gas company obtains a certificate of public convenience and necessity, the NGA gives the company eminent domain authority to condemn property it needs to provide the necessary service. See 15 U.S.C. § 717f(h).

The NGA expressly leaves to states the regulation of retail sales, as well as purely intrastate wholesales and transportation of natural gas. See id. § 717(b), (c); see also

5

Gen. Motors Corp. v. Tracy, 519 U.S. 278, 292-93 (1997); Fuel Safe, 389 F.3d at 1317.

In addition, the NGA reserves to states "the power to regulate the physical production and gathering of natural gas in the interests of conservation or of any other consideration of legitimate local concern." Interstate Natural Gas Co. v. Fed. Power Comm'n, 331 U.S. 682, 690 (1947); see also Panhandle E. Pipeline Co. v. Oklahoma, 83 F.3d 1219, 1225-26 (10th Cir. 1996). For NGA purposes, production and gathering of natural gas "are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution." N. Natural Gas Co. v. State Corp. Comm'n, 372 U.S. 84, 90 (1963); see also Panhandle E. Pipeline, 83 F.3d at 1225-26. Kansas regulates natural gas production through the Kansas Corporation Commission ("KCC"). See Zinke & Trumbo, Ltd. v. State Corp. Comm'n, 749 P.2d 21, 24 (Kan. 1988).

**B. Factual background**

Turning to the facts at issue in these appeals, the district court, following an evidentiary hearing, made the following factual findings, which the parties do not challenge on appeal: In 1932, natural gas was discovered in south central Kansas, in what is now known as Cunningham Field (the "Field"). Natural gas was extracted there, from the Viola geological formation, beginning in 1934; the Field's reserves were depleted by 1977. Northern then decided to use the Field as an underground storage facility. In order to do so, Northern obtained certificates of public convenience and necessity from both the KCC and the Federal Power Commission, FERC's predecessor. These certifications permit Northern to store natural gas in over 26,000 acres located in

both the Viola and Simpson geological strata.

After obtaining these certificates of public convenience and necessity, Northern, in 1979, began injecting natural gas into the Field for storage. After a several-year "fill-up" period during which Northern re-pressurized the Field, the Field remained "essentially stable" from 1985 through 1995. (Aplt. App. at 1926.) Cunningham Field is the largest of fifteen underground natural gas storage fields in Kansas, and one of the largest twenty-five such fields in the United States.

Northern thought that Cunningham Field would be a good underground natural gas storage facility because Northern believed there were several faults surrounding the Field that would seal the stored gas inside the Field. But as it turned out, the fault at the northern end of the field did not fully seal in the natural gas. Instead, an aquifer, acting with the fault, had originally formed the northern boundary of the Field.

> [D]uring primary production of the field the aquifer acted as a limited water drive, pushing native gas out of pore spaces and allowing water to move in, with a corresponding reduction in pressure of the aquifer north of the fault. Later, during the Cunningham storage field "fill up" period, storage gas injected by Northern was pushed past the northern fault and into the aquifer, thereby increasing pressure in the aquifer north of the field. The field stabilized in 1985 and remained stable for about ten years thereafter.

(Id. at 1930.) Beginning in approximately 1994, however, other natural gas producers began extracting gas and large amounts of water just north of the Field, causing "pressure sinks" that destabilized the Field and resulted in the migration of Northern's storage gas northward beyond the Field's boundary. (Id.)

In 2005, FERC permitted Northern to drill two withdrawal wells near the Field's

7

northern boundary, in an effort to recapture the stored natural gas that was migrating northward, and further permitted Northern to drill two observation wells at the Field's northern boundary in order to determine whether Northern's recapture efforts were successful. The withdrawal wells, however, were unable to stop the northward migration of Northern's storage gas.

In 2007, Northern requested that FERC permit Northern to expand the Field's northern "buffer zone" by 4,800 acres. (Id. at 1927.) FERC agreed to expand the buffer zone, but only by 1,760 acres because Northern had failed to prove its storage gas had migrated further than that. FERC did not authorize Northern to inject or store any natural gas in this buffer zone.

## C.  This litigation

Northern initiated this lawsuit in December 2008, suing three natural gas producers, L.D. Drilling, Inc. (L.D. Drilling"), Nash Oil & Gas, Inc. ("Nash"), and Val Energy, Inc. ("Val Energy"), which together have approximately twenty-five wells, located four to seven miles north of the Field, producing natural gas from the Viola formation. Northern also named as defendants those individuals or entities holding non-operating working or royalty interests in Defendants' challenged wells.[1] Northern alleged that Defendants, through the challenged wells, were extracting Northern's migrating storage gas. Moreover, Northern contended that Defendants' use of their wells

---

[1] Northern also initiated another, similar lawsuit in federal court, No. 08-cv-01400-WEB-DWB, which the district court consolidated with the initial federal action underlying these appeals, No. 08-cv-01405-WEB-DWB.

to remove natural gas, along with large amounts of water, was creating "pressure sinks" that caused more of Northern's stored natural gas to migrate faster and faster out of the Field toward Defendants' wells.

Based on these theories, Northern asserted claims under Kansas law seeking title to the natural gas being produced by Defendants and declaratory and injunctive relief, as well as damages, based upon claims for conversion, unjust enrichment, nuisance and civil conspiracy. In response, Defendants asserted a number of counterclaims against Northern. The only claim at issue in these interlocutory appeals, however, is Northern's nuisance claim.

While this federal litigation was pending, Northern applied to FERC for permission to expand Cunningham Field's buffer zone to include the area where most of Defendants' challenged wells are located. Defendants intervened in that agency action and objected to this expansion of the Field's buffer zone. Nevertheless, in June 2010, FERC issued Northern a certificate of public convenience and necessity permitting Northern to add more than 12,000 additional acres (the "expansion area") to the Field's northern buffer zone, in the Viola and Simpson geological formations. FERC granted this new certificate after Northern presented evidence showing that its natural gas stored in Cunningham Field was migrating northward out of the Field. FERC found in particular that "Northern had shown that there is a two-mile wide primary gas migration pathway from the storage field into the expansion area." (Id. at 1929.) In issuing the certificate of public convenience and necessity, FERC considered but rejected arguments

made by objectors that the Field "should be abandoned because the lack of migration barriers in the expansion area made the field unsuitable for storage." (Id. at 1930.) Instead, FERC agreed generally to a four-step plan Northern proposed to contain the stored gas and stop its northward migration. That plan required Northern to do the following: 1) to "shut in all third party production north of the northern fault"; 2) to monitor pressures to see if stopping third-party production to the north returned pressures along the Field's northern boundary to pre-1995 levels; 3) if this pressure did not return to pre-1995 levels, to inject water at the north end of the Field in order to raise pressure there; and 4) possibly "bring[] shut-in wells into production or install[] offset wells to counter any third-party production adjacent to the expansion area." (Id.) In approving at least the first three steps of this proposed four-step plan, FERC ordered Northern to develop a more specific migration control plan within six months of FERC's issuing Northern the certificate of public convenience and necessity. Defendants did not appeal FERC's ruling and that administrative decision is now final.

After obtaining from FERC the certificate of public convenience and necessity for the expansion area, Northern initiated a second lawsuit in federal court in the District of Kansas, seeking to exercise the eminent domain authority granted Northern by the NGA to condemn the needed property located within the expansion area, N. Natural Gas Co. v. Tract No. 106710, No. 6:10-cv-1232-MLB-DWB (D. Kan.). That litigation remains

ongoing.[2]

Following FERC's issuance to Northern of a certificate for the expansion area,

Northern, in this litigation, sought a preliminary injunction enjoining Defendants from

producing natural gas or water from their challenged wells located in the expansion area.

The district court granted that injunction. In these consolidated interlocutory appeals,

L.D. Drilling and Nash challenge the preliminary injunction.[3]

## II.  STANDARD OF REVIEW

We review the district court's decision to grant a preliminary injunction for an

abuse of discretion. See Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012). "An

abuse of discretion occurs only when the trial court bases its decision on an erroneous

conclusion of law or where there is no rational basis in the evidence for the ruling." Id.

(internal quotation marks omitted).

"In order to secure a preliminary injunction, the moving party," here Northern,

"must establish the following elements:  (1) a substantial likelihood of success on the

merits; (2) irreparable injury will result if the injunction does not issue; (3) the threatened

injury to the movant outweighs any damage the injunction may cause the opposing party;

---

[2] During oral argument, Northern's attorney assured this court that Northern intended to proceed with the condemnation action. Currently, discovery remains ongoing in the eminent domain case, with a status conference set for October 2012. The district court previously entered a preliminary injunction in that case permitting Northern to take immediate possession of certain affected properties, subject to a later determination of just compensation to be paid for those properties.

[3] Both the district court and this court denied Defendants' motions to stay operation of the preliminary injunction while these appeals remain pending.

11

and (4) issuance of the injunction would not be adverse to the public interest." Kan. Judicial Watch v. Stout, 653 F.3d 1230, 1233 n.2 (10th Cir. 2011). Although "[g]enerally, where the three latter harm factors weigh in favor of the movant, the probability of success factor is relaxed," that is not the case here, where the requested injunction is one that alters the status quo and therefore is disfavored. Flood v. ClearOne Commc'ns, Inc., 618 F.3d 1110, 1117 n.1 (10th Cir. 2010). Instead, Northern had to make a "strong showing" of both the likelihood of success on the merits of its nuisance claim and that the balance of the harms favored issuing the requested injunction. Id. (internal quotation marks omitted). The district court applied this more stringent standard in granting Northern the preliminary injunction at issue here.

On appeal, Defendants challenge only the district court's determination that there is a substantial likelihood Northern will prevail on its nuisance claim. We consider only that issue here. Our review is further circumscribed by the fact that the question of who has title to the gas that has already migrated out of the Field is not determinative of Northern's nuisance theory. Northern's theory, instead, is that Defendants' continued production from their wells located in the expansion area would draw out the gas Northern is currently storing in the Field. Therefore, in determining here whether the district court abused its discretion in concluding that there was a substantial likelihood that Northern would prevail on its nuisance claim, we do not address the question of who has title to the natural gas that has already migrated out of the Field.

12

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DETERMINING THERE WAS A SUBSTANTIAL LIKELIHOOD NORTHERN WILL PREVAIL ON ITS NUISANCE CLAIM

Under Kansas law, "[a] private nuisance is a tort related to an unlawful interference with a person's use or enjoyment of his land." Smith v. Kan. Gas Serv. Co., 169 P.3d 1052, 1061 (Kan. 2007) (internal quotation marks omitted). As just mentioned, Northern's theory underlying its nuisance claim is that Defendants' continued production of natural gas and water through their wells located in the expansion area is lowering the pressure in that area, causing more and more of the natural gas Northern is storing in Cunningham Field to migrate at a faster pace northward out of the Field and into the expansion area. Specifically, Northern alleged the following: Defendants' production through their expansion area wells was interfering with Northern's use and enjoyment of Cunningham Field as an underground storage facility for natural gas by creating "'pressure sinks' that have drawn, and continue to draw, Northern's storage gas from the Cunningham Storage Field through a two-mile wide geologic pathway." (Aplt. App. at 246 ¶ 135.) This pathway has now become saturated with gas, which "causes the volume of storage gas migrating along such pathways to increase." (Id. at 247 ¶ 136.) This increased migration interferes with Northern's "natural gas storage operations authorized by [FERC] and the KCC, and impede[s] Northern's ability to maintain the storage integrity of the Cunningham Storage Field." (Id.)

The parties agree that, to succeed on this nuisance claim, Northern must establish the following four elements:

13

(1) [T]he defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial; and (4) the interference was of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land.

Pagel v. Burlington N. Santa Fe Ry. Co., 316 F. Supp. 2d 984, 989 (D. Kan. 2004) (citing

Williams v. Amoco Prod. Co., 734 P.2d 1113, 1124-25 (Kan. 1987), which applied

Prosser and Keeton on Torts, § 87, pp. 622-23 (5th ed. 1984)).

## A. No one disputes that there has been interference with Northern's use and enjoyment of the Field and that the interference has been substantial

Regarding Defendants' interference with Northern's use of the Field for storing

natural gas, the district court found the following:

There is strong and clear evidence that storage gas from the previously-certified areas of the field (i.e. from the pre-2010 borders) is migrating out to the expansion area and has been doing so for some time, with wells even in the northern portion of the expansion area producing primarily storage gas, even though some of those wells are more than 6 miles from the underground fault. The defendants' production of substantial amounts of storage gas and water will likely continue to draw storage gas beyond the underground fault and out of the storage field as long as such production continues, threatening the continued viability of the storage facility.

(Aplt. App. at 1950.) Thus, the district court found that Defendants' production from

their expansion area wells was interfering with Northern's use of the Field as a storage

facility, and the court went on to find that this interference was substantial. On appeal,

Defendants do not dispute these findings. And there is evidence in the record to support

14

them.[4]

**B. There is a substantial likelihood Northern will be able to establish that Defendants acted with the intent to interfere with Northern's use and enjoyment of Cunningham Field**

To succeed on its nuisance claim, Northern must also establish that Defendants

acted with the intent to interfere with Northern's use of the Field to store natural gas. See

Pagel, 316 F. Supp. 2d at 989. Regarding such intent, the district court found the

following:

> [A]fter the June 2, 2010 FERC order [granting Northern a certificate of public convenience and necessity for the expansion area] – which the defendants chose not to appeal – the defendants were clearly on notice that their wells were producing primarily if not entirely storage gas, and that

_____

[4] Briefly summarized here, the evidence Northern presented to the district court at the evidentiary hearing indicated the following: During the time Northern was extracting native natural gas from the Field, from 1934 to 1977, none of the wells drilled north of the Field produced any natural gas. It was not until the mid-1990s, after Northern had been using the Field as an underground storage facility for approximately fifteen years, that wells in the expansion area began producing significant amounts of natural gas. Further, the pattern of discovery of these productive wells in the expansion area was unlike the discovery pattern that would be expected when drilling for native gas. In addition, these "wells are not experiencing a normal decline in production as would be expected from production of native gas." (Aplt. App. at 1951.) And the chemical composition of the natural gas being produced from these wells matches the chemical composition of Northern's stored natural gas, but does not match native natural gas recovered in that area. In addition to this evidence suggesting that the natural gas Defendants' challenged wells are extracting is Northern's storage gas, Northern also presented expert testimony explaining why Northern was originally fooled by the imperfect seal provided by the fault at the northern edge of the Field, why that seal eventually failed, and why the natural gas has been migrating toward the north, beyond the Field's original boundary. These experts further explained that Defendants' continued extraction of gas and large amounts of water north of the Field creates "pressure sinks" that cause Northern's stored gas to migrate at a faster pace northward, beyond the Field's boundary and toward Defendants' wells.

15

their production of significant amounts of water was likely influencing the migration of storage gas from the Cunningham field. Whatever the defendants' intentions up to the point of the FERC order, their continued production thereafter with knowledge that they were causing storage gas to migrate can now be viewed as an <u>intentional</u> and substantial interference with Northern's use of the Cunningham Storage Field.

(Aplt. App. at 1952 (emphasis added).)

The district court did not abuse its discretion in reaching this determination. Northern presented evidence to the district court that Defendants' production of natural gas and water from their expansion area wells was siphoning off gas Northern was storing in the Field. Northern had previously presented that evidence to FERC, in order to obtain the certificate of public convenience and necessity for the expansion area. And Defendants participated in those FERC proceedings. Thus, by at least the time FERC issued Northern the certificate for the expansion area, in June 2010, Defendants knew that continued production from their expansion area wells was causing natural gas to migrate at a faster rate out of the Field and toward Defendants' wells. Yet Defendants persisted in producing gas and water from those wells. That evidence was sufficient for the district court to determine that there was a reasonable likelihood that Northern will be able to prove that, at least by June 2010, Defendants were intentionally causing the migration of more natural gas out of Northern's storage field.

On appeal, Defendants argue that the district court's determination - that Defendants intentionally interfered with Northern's use of its Field to store natural gas by continuing to produce natural gas from their expansion area wells, knowing that

16

production would draw more of Northern's stored natural gas out of the storage field and into the expansion area - was insufficient to establish that Defendants acted with the "bad intent" to harm Northern needed to support Northern's nuisance claim. (Aplt. Br. at 34.) But, for purposes of a nuisance claim, Kansas case law does not require proof that a defendant acted with malice or bad intent.

> Occasionally, the defendant may act from a malicious desire to so harm for its own sake; but more often the situation involving a private nuisance is one where the invasion is intentional merely in the sense that the defendant has created or continued the condition causing the interference with full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow.

St. David's Episcopal Church v. Westboro Baptist Church, Inc., 921 P.2d 821, 828 (Kan. Ct. App. 1996) (quoting Prosser and Keeton on Torts § 87, pp. 624-25 (5th ed. 1984)); see also Sandifer Motors, Inc. v. City of Roeland Park, 628 P.2d 239, 246 (Kan. Ct. App. 1981). Thus, it is enough under Kansas law for Northern to show that Defendants "act[ed] with the purpose of causing the nuisance, or kn[e]w that it [wa]s resulting or substantially certain to result from his or her conduct." United Proteins, Inc. v. Farmland Indus., Inc., 915 P.2d 80, 85 (Kan. 1996) (citing Restatement (Second) of Torts § 825(a) and (b) (1965)).

## C. The nature, duration, or amount of Defendants' interference with Northern's use of the Field was unreasonable

Lastly, to prevail on its nuisance theory, Northern also has to establish that Defendants' interference with Northern's use and enjoyment of Cunningham Field "was of such a nature, duration or amount as to constitute unreasonable interference with

[Northern's] use and enjoyment of the land." Williams, 734 P.2d at 1124-25 (emphasis

added; quoting Prosser and Keeton on Torts, § 87, pp. 622-23 (5th ed. 1984)). "This does

not mean that the defendant's conduct must be unreasonable. It only means that the

interference must be unreasonable." Id. at 1125 (quoting Prosser and Keeton on Torts,

§ 87).

In deciding whether interference is unreasonable, Kansas law requires a court to

consider the particular facts of a given case and weigh a number of factors:

> What may or may not constitute a nuisance in a particular case depends
> upon many things, such as the type of neighborhood, the nature of the thing
> or wrong complained of, its proximity to those alleging injury or damage,
> its frequency of continuity, and the nature and extent of the injury, damage
> or annoyance resulting. Each case must of necessity depend upon its own
> particular facts and circumstances.

Vickridge First & Second Addition Homeowners Ass'n, Inc. v. Catholic Diocese, 510

P.2d 1296, 1302-03 (Kan. 1973) (internal quotation marks omitted).

A court must also consider the social value of the competing interests:

> Reasonableness is a question of fact to be determined in each case by
> weighing the gravity of the harm to the plaintiff against the utility of the
> conduct of the defendant. . . . Determination of the gravity of the harm
> involves consideration of the extent and character of the harm to the
> plaintiff, the social value which the law attaches to the type of use which is
> invaded, the suitability of the locality for that use, the burden on plaintiff to
> minimize the harm, and other relevant considerations arising upon the
> evidence. Determination of the utility of the conduct of the defendant
> involves consideration of the purpose of the defendant's conduct, the social
> value which the law attaches to that purpose, the suitability of the locality
> for the use defendant makes of the property, and other relevant
> considerations arising upon the evidence.

St. David's Episcopal Church, 921 P.2d at 828 (internal quotation marks, alteration

18

omitted).

In this case, in determining that there was a substantial likelihood that Northern could establish that Defendants' intentional interference with Northern's use of the Field to store natural gas was unreasonable, the district court considered all of the circumstances at issue in this case and carefully weighed the relevant factors as well as the parties' competing interests. See Sandifer Motors, 628 P.2d at 243-44 (weighing relevant factors). In particular, the district court acknowledged Defendants' "right to produce natural gas to which they or their lessors hold title in the expansion area" and the facts that "Northern's erroneous assessment of the underground fault appears to have contributed at least in part to the situation it now claims to be a nuisance" and that "Northern could also bear potential liability for what amounts to [its] unauthorized use of the Viola formation" to store natural gas "in the expansion area." (Aplt. App. at 1952-53.) The Court also weighed several other factors, including the fact that, although Defendants have an interest in drilling and producing native natural gas from their challenged wells, "there is strong evidence that all of the wells at issue would, if allowed to continue operating during this litigation, produce primarily storage gas." (Id. at 1953.) Lastly, the court factored in the public interest served by using Cunningham Field as an underground natural gas storage facility.

Weighing all of these competing interests and relevant factors, as Kansas law directs, the district court concluded that there was a substantial likelihood that Northern will be able to prove Defendants' continued production of storage gas from their

expansion area wells amounts to an unreasonable interference with Northern's use and enjoyment of its storage facility. We cannot say that that determination was an abuse of discretion.[5]

Defendants counter that their continued production of natural gas in the expansion area, even after FERC issued Northern a certificate of public convenience and necessity for that area, cannot be unreasonable because the KCC previously authorized Defendants to drill those wells and a Kansas court, in parallel state-court action litigation involving these same parties upheld Defendants' production from those wells and declined to reconsider that ruling after the June 2010 FERC certification. These arguments are insufficient to justify overturning the preliminary injunction.

First, the fact that the KCC previously permitted Defendants to drill wells in the expansion area does not immunize Defendants from Northern's nuisance claim. Under

---

[5] In reaching this conclusion, we do not consider here two other factors that the district court considered. First, the district court considered that "Kansas law appears clear that the certificate [of public convenience and necessity FERC has now issued for the expansion area] means Northern retains title at least to any storage gas that has migrated or will migrate to the Expansion Area from June 2, 2010 [the date of the FERC certification] and thereafter." (Aplt. App. at 1953.) Because we need not otherwise address who has title to the natural gas that has already migrated out of the storage field, we do not consider this factor here. Although the district court did consider it, the other factors on which the district court based its unreasonable interference determination were sufficient, on their own, to justify the district court's decision to issue the preliminary injunction. The second factor the district court considered, which we do not, is the fact that Defendants' wells are located in the expansion area and are, thus, now subject to Northern's condemnation action. (Id. at 1954.) Although the district court mentioned this factor in concluding Defendants' interference was unreasonable, this fact instead appears more relevant to the district court's determination that the balance of harms weighed in favor of granting Northern the preliminary injunction.

Kansas law, "the fact that a business is carried on lawfully and in accordance with ordinary methods does not relieve one from liability if the use is unreasonable and as such constitutes a nuisance." Williams, 734 P.2d at 1122 (citing Helms v. E. Kan. Oil Co., 169 P. 208 (Kan. 1917)); see also Rosedale Drive-In Theater, Inc. v. Burlington N. R.R., No. 90-2412-V, 1992 WL 135020, at *4 (D. Kan. May 29, 1992) (unreported) (noting that, even though it may have been lawful to build the bridge abutment at issue, that abutment "may still be the subject of an actionable nuisance").

> Whether or not a use which in itself is lawful is a nuisance depends upon a number of circumstances – locality and surroundings, the number of people living there, the prior use, whether it is continual or occasional, and the extent of the nuisance and injury caused to the neighbor from the use.

Williams, 734 P.2d at 1122 (quoting Helms, 169 P. at 208).[6]

Second, Defendants overstate what the Kansas state court concluded in the parallel

---

[6] Defendants rely on Atchison, Topeka & Santa Fe Railway v. Armstrong, 80 P. 978 (Kan. 1905), to argue, to the contrary, that because the KCC permitted Defendants to drill their wells in the expansion area, production from those wells cannot be unreasonable. Armstrong, however, concerned the authorized operation of a railroad, which the Kansas Supreme Court noted is a "public necessity," which "bring to the public great benefits," and which also necessarily subjects the public to "incidental inconveniences, such as noise, smoke, cinders, vibrations of the ground, interference with travel at the crossings of roads and streets, and the like." Id. at 980. Armstrong noted that "[s]uch inconveniences are common to the public at large. If each person had a right of action because of such inconveniences, it would go far to render the operating of railroads practically impossible." Id. For these reasons, Armstrong held that "a railroad authorized by law, and lawfully operated, cannot be deemed a private nuisance." Id. (internal quotation marks omitted). Defendants, however, have failed to persuade us that the circumstances at issue in this case, involving private entities drilling for natural gas for their own benefit, is analogous to the circumstances addressed in Armstrong. This is particularly so in light of later Kansas authority, cited above, indicating that even a lawfully operated business can cause a nuisance.

21

state litigation. In that state case, Northern sued the purchasers of the natural gas Defendants were producing, alleging that those purchasers were converting Northern's natural gas that had migrated northward out of Cunningham Field. In that state case, the purchasers impleaded Defendants, asserting that if the purchasers were liable for converting Northern's natural gas, then Defendants were liable to the purchasers for that conversion. In the state case, the trial court, applying Kan. Stat. § 55-1210, rejected Northern's conversion claim after holding that Northern had lost title to its stored gas once that gas migrated several miles away from the Field. The state case, then, involved a different question than the one posed here. The state case addressed whether Northern had still had title to the natural gas that migrated several miles away from the Field. Here, on the other hand, the issue is whether Defendants' production from their wells in the expansion area unreasonably interfered with Northern's storing its natural gas in the Field. Therefore, the state court's decision in the state-court proceeding cannot make Defendants' interference with Northern's storage field reasonable.[7]

**D. The district court did not abuse its discretion in determining there was a substantial likelihood that Northern will prevail on its nuisance claim**

---

[7] On appeal, Defendants further suggest that the state trial court's decision in the parallel state action should have preclusive effect in this federal litigation. For the same reason, the state court decision does not preclude Northern's recovery under its nuisance theory. Defendants also assert that the state court concluded that Defendants were not interfering with Northern's use of the Field to store natural gas. That interference determination, however, was not made in the context of a nuisance claim, but was instead premised on Kan. Stat. § 55-1210(b), which the state court ruled was limited to gas migrating to "adjoining property." (Aplt. App. at 792-94.) That limitation does not apply to this nuisance claim. We note, further, that this state case is still pending before the Kansas Supreme Court.

22

To summarize, the parties agree that, to prevail on its nuisance claim, Northern must establish four things: 1) Defendants acted with the intent to interfere with Northern's use and enjoyment of the storage field; 2) there was some interference with the use and enjoyment of the Field of the kind Defendants intended; 3) that interference was substantial; and 4) the interference was of a such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the Field. See Pagel, 316 F. Supp. 2d at 989. The district court did not abuse its discretion in determining that there was a substantial likelihood that Northern could prove all four of those elements of its nuisance claim.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the preliminary injunction.